Stanley Haimowitz v. Commissioner.
Haimowitz v. Commissioner
Docket No. 3601-68.
United States Tax Court
T.C. Memo 1971-241; 1971 Tax Ct. Memo LEXIS 93; 30 T.C.M. (CCH) 1034; T.C.M. (RIA) 71241; September 21, 1971, filed. O. John Rogge and Richard H. Rosenberg, 32Court, Brooklyn, N. Y., for the petitioner. Michael Phalin for the respondent. 1035 QUEALY
Memorandum Findings of Fact and Opinion QUEALY, Judge: This case involves a deficiency in the Federal income tax of the petitioner for the taxable year 1964. The amount of the deficiency as set forth in the statutory notice is $77,626.43 in additional taxes and $3,881.32 in penalties asserted under section 6653(a). [1] At trial, the Court granted an oral motion to amend the pleadings. This amendment has the effect of increasing the amount of the deficiency involved beyond the amount specified in *94 the statutory notice. Our determination in this case relates to the deficiency which results from the granting of the amendment. The issues presented for decision are: (1) Whether petitioner was a partner with another individual in a gambling venture from which petitioner derived unreported gambling income. (2) Whether petitioner is liable for penalties asserted under section 6653(a). (3) Whether petitioner incurred gambling losses in the year 1964 in the amount of $9,724. Findings of Fact Some of the facts have been stipulated. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. [2]
*95 Petitioner Stanley Haimowitz (hereinafter referred to as the "petitioner") filed his individual income tax return for the calendar year 1964 with the district director of internal revenue at Brooklyn, New York, using the cash receipts and disbursements method of reporting his income. During the year 1964 and at the time of the filing of the petition herein, petitioner resided in Brooklyn, New York with his parents. Petitioner's father and mother were 73 and 70 years of age, respectively, in the year 1964. Neither of petitioner's parents, nor petitioner, was employed during the year 1964. Melvin Murray Lichtman (hereinafter referred to as "Lichtman") was a friend of the petitioner during 1964, the year in question in this proceeding. Petitioner and Lichtman had lived "diagonally across" the street from one another. Lichtman was unemployed during the year in question. In 1964, petitioner and Lichtman occasionally accompanied one another to horseracing tracks. On these occasions, they would not necessarily stay together at the races but would often meet after the races and go home together. During the period in question, both petitioner and Lichtman engaged in betting on the twin *96 double at the New York State racetracks. During 1964, the twin double was a system of pari-mutuel betting authorized at certain New York State racertracks. The twin double was a wagering pool based on the results of the sixth, seventh, eighth, and ninth horse races run on a given day. Eight horses were entered in each of these four races. A bettor purchased a $2 pari-mutuel ticket for the sixth and seventh races containing the numbers of the two horses he had selected as winners in those two races. If the bettor had correctly selected the winners of these two races, he would have had a "live" ticket in his possession at the conclusion of the seventh race. The bettor then returned to a parimutuel window and exchanged, without further cost, his "live" ticket for another ticket containing the numbers of the two horses he had selected as winners in the eighth and ninth races. Tickets for the eighth and ninth races could only be obtained in exchange for "live" tickets. If the bettor had correctly selected the winners of these two races, he would have had a winning twin double ticket in his possession at the conclusion of the ninth race. In order to cash a winning twin double ticket, *97 it was necessary to present it at a verifier's window. The person presenting the winning ticket was required to present some form of acceptable personal identification and personally sign a form prepared by the verifier on the basis of the information so provided. A copy of this form was then given to the person presenting the winning ticket. The copy of this form and the winning ticket then had to be taken and presented to a cashier's window for actual payment in cash or by check. Officials at the racertracks prepared Internal Revenue Service Forms 1099 based 1036 on the information obtained by the verifiers as to each person presenting winning twin double tickets. The originals of the Forms 1099 were sent to the Internal Revenue Service, and a copy was sent to the person who had signed the verifier's form. Petitioner went to the racetrack (either Yonkers or Roosevelt Raceway in New York) approximately forty times in 1964 for the exclusive purpose of wagering on the twin doubles. Petitioner was successful in picking the first half of the twin double approximately ten times and for the remaining thirty times he purchased "live" twin double tickets from persons who would sell *98 those tickets at a premium rather than continue to play the twin double themselves. Petitioner claimed that he invested $100 each night in the purchase of first-half twin double tickets. On those nights on which petitioner was not successful in his initial selections (approximately thirty times), petitioner claimed that he would invest an additional $200 in "live" twin double tickets. Petitioner won a twin double on October 21, 1964 in the amount of $13,800.20. Petitioner also won a twin double on November 19, 1964 in the amount of $5,391.90. These two winning tickets were cashed by the petitioner and reported on his 1964 income tax return. A number of twin double betting syndicates were active at New York State racetracks during 1964. These twin double betting syndicates utilized professional ticket cashers to verify and cash their winning twin double tickets so as to avoid the payment of income tax on the amounts won. Joseph R. Pipitone (hereinafter referred to as "Pipitone") and Philip A. Beloff (hereinafter referred to as "Beloff") operated together as professional ticket cashers at New York State racetracks during 1964. Edward Osterweil also operated as a professional *99 ticket casher at New York State racetracks during 1964. Marvin Starr was also involved in cashing twin double tickets during 1964. Petitioner and Lichtman were indicted on April 7, 1966 in the United States District Court on eight counts for the offense of willfully, unlawfully, and knowingly aiding and assisting in, procuring, counseling, advising, and causing the preparation of United States Information Returns which were false and fraudulent as to material matters, and one count for the offense of conspiracy to do so. On February 2, 1967, petitioner and Lichtman were tried together by a jury in the United States District Court, Southern District of New York, on the charges contained in the indictment of April 7, 1966. The jury found both petitioner and Lichtman guilty on each count of each charge contained in the indictment. Petitioner was adjudged convicted on March 6, 1967 on each count of each offense specified in the April 7, 1966 indictment. He was sentenced to imprisonment for a period of one year and one day on each count contained in the indictment, the sentences to run concurrently with each other. Petitioner's conviction was affirmed upon appeal by the United States *100 Court of Appeals, Second Circuit, on October 28, 1968. In the instant case, the determination of the deficiency in the petitioner's Federal income tax for 1964 was based on the respondent's assertion that the petitioner had failed to report substantial racetrack winnings, and that he had failed to substantiate his claimed racetrack losses. In asserting this deficiency, respondent alleges that the petitioner and Lichtman were partners in a gambling venture, and that they received a total of $249,265.20 [3] in racetrack winnings by paying others to cash their winning tickets. Then, on the basis of this alleged partnership between the petitioner and Lichtman, the respondent assigns to the petitioner one-half of the total $249,265.20 allegedly cashed for the partnership by those other persons. After deducting those amounts which the petitioner had reported as racetrack winnings, he arrives at the $105,432.60 of additional income for the petitioner, which is the basis of the deficiency involved herein. *101 Those persons alleged by the respondent to have cashed winning twin double tickets for the petitioner and Lichtman and the amounts representing the winning twin double tickets allegedly cashed by each of them for the petitioner and Lichtman and utilized by the respondent in making the assessment in this case are as follows: 1037 Edward Osterweil
Date of Cashing
Amount
June 27, 1964
$11,884.20
July 10, 1964
8,067.70
July 17, 1964
22,343.80
October 1, 1964
11,158.60
December 7, 1964
15,901.60
December 10, 1964
5,543.70
December 10, 1964 5,543.70
Total
$80,443.30 $80,443.30 *03
Joseph Pipitone [4]
Date of Cashing
Amount
September 7, 1964
$11,873.50
September 7, 1964
14,719.60
September 7, 1964 16,751.10
Total
$43,344.20 [5] $43,344.20 *03
Philip Beloff [6]
Date of Cashing
Amount
Auugst 21, 1964
$29,439.20
September 11, 1964 15,026.40
Total
$44,465.60 $44,465.60 *03
Marvin Starr
44 twin double tickets cashed during 1964 totalling $80,993.60 [7] $80,993.60
*102 Total amount allegedly received by petitioner and Lichtman from ticket cashers and utilized by the respondent as the basis for his assessment of unreported income to the petitioner in this case $249,246.70 [8]
*103 At the criminal trial, Edward Osterweil testified that he cashed winning twin double tickets for Lichtman totalling "close to two hundred thousand" dollars; however, he specifically testified as to six of the eight counts considered at the criminal trial totalling only $80,443.30 in proceeds from seven winning twin double tickets. He did not claim to have cashed any tickets directly for the petitioner; [9] and, in determining the total amount of unreported income allegedly received by the petitioner-Lichtman partnership for purposes of asserting the deficiency now before us, the respondent included only the $80,443.30 representing the proceeds from the winning tickets which Osterweil specifically indicated he had cashed for Lichtman. With respect to Beloff and Pipitone, each testified at the criminal trial that he had cashed $100,000 worth of winning *104 tickets for either petitioner or Lichtman (without specifying as to which one). However, the respondent has utilized only those tickets and amounts specified above in determining the amount of the total unreported racetrack winnings alleged to have been received by the petitioner and Lichtman. Furthermore, Beloff and Pipitone each could specifically identify only one such transaction. Pipitone testified only as to the ticket listed above as having been cashed by him on October 1, 1964, and Beloff testified only as to the ticket listed above as having been cashed by him on October 20, 1964. As to the other tickets cashed above as having been cashed by them for the alleged partnership of the petitioner and Lichtman, 1038 neither Beloff nor Pipitone testified as to the specifics of the cashing of such tickets; and neither of them specifically identified for whom he had cashed said tickets and to whom he had given the proceeds. Marvin Starr did not testify at either the criminal trial or in the proceeding before this Court, and the respondent has introduced no evidence specifically identifying any of the tickets alleged to have been cashed by him for the partnership. The respondent *105 has also not introduced any evidence to specifically identify for whom Starr had cashed said tickets or to whom he had given the proceeds. Thus, there has been no showing of any connection between the petitioner and Starr. Ultimate Findings of Fact 1. The respondent has not met his burden of coming forward with evidence which is sufficient to overcome testimony of the petitioner which was adequate for purposes of sustaining a determination that the petitioner had no unreported racetrack winnings in the taxable year 1964. 2. The petitioner had no unreported racetrack winnings in the taxable year 1964. 3. The petitioner has failed to substantiate $9,574 in claimed gambling losses for the taxable year 1964. Opinion I. Unreported Income During 1964, Yonkers and Roosevelt Raceways in New York State operated a system of pari-mutuel betting known as the "twin double." In playing the twin double, the bettor purchased a ticket for horses in the sixth and seventh races. If successful in those races, he exchanged this ticket for another ticket for horses in the eighth and ninth races. If these horses also won, the better had a winning "twin double" ticket, the winnings on which *106 often ran into a five figure amount. Gambling winnings (in excess of $600) constitute taxable income under section 61 of the Internal Revenue Code. As payors of such winnings, racetracks and raceways are required by section 6041 to prepare and file United States Information Returns (Forms 1099) which report to the Secretary of the Treasury the name, address, and social security number of the person to whom such gambling winnings are paid. In order to comply with these reporting requirements and pursuant to instructions from the Internal Revenue Service, New York State racetracks in 1964 required a winning twin double ticket to be presented at a verifier's window before it could be cashed. The individual presenting the winning ticket was required to verify his name, address, and social security number by presenting an acceptable form of personal identification and social security card. The verifier then prepared a form containing this identification information, information concerning the winning ticket, and the amount won. The individual presenting the ticket was *107 required to sign the completed verification form. The individual was then given a copy of this form. This copy and the winning ticket then had to be taken and presented to a cashier's window for actual payment. From the verification forms, track officials prepared United States Information Returns (Form 1099) as to each individual presenting winning twin double tickets. The original Forms 1099 were sent to the Internal Revenue Service, the first copies were sent to the New York State Income Tax Bureau, the second copies went to those individuals whose names appeared on the verification form, and the final copies were retained for the records of the raceway. The actual owners of winning twin double tickets would in some instances have other individuals verify and then cash their winning tickets in order to avoid having to report the winnings on their income tax returns. Philip Beloff and Joseph Pipitone, government witnesses at the criminal trial, were frequent visitors to Yonkers Raceway and Roosevelt Raceway during 1964. They both testified that they cashed winning twin double tickets which they received from other persons. They indicated that on each occasion they completed *108 the verification forms and vouchers by filling in their own names, addresses, and social security numbers. According to their testimony, they turned over the proceeds from the cashing of these winning tickets to the persons from whom they originally received the tickets and were compensated for their efforts by payment in the form of a commission. Both Pipitone and Beloff testified that there were a number of so-called "mobs" operating at Roosevelt and Yonkers Raceways in 1964, and that these "mobs" formed twin double betting syndicates for whom they verified and cashed winning tickets. They both testified that one of these "mobs" 1039 was known as the "Harpo mob" and consisted of a two-man twin double betting syndicate, namely, petitioner and Lichtman. (Petitioner was known to both Beloff and Pipitone as "Harpo.") Beloff and Pipitone testified that their initial contact with the "Harpo mob" was through Lichtman whom they met in the early part of the summer of 1964. On direct examination at the criminl trial, Pipitone responded to certain questions concerning this initial meeting with Lichtman as follows: "Q. Did he (Lichtman) ask you to do anything at that time?" "A. Well, *109 he says that when him and his partner would hit the twin they would come on over and throw some business our way." "Q. Business for what, sir?" "A. For their winning twin double tickets." "Q. Did he ask you to cash them?" "A. Yes, sir." Q. Did he indicate who his partner was?" "A. Harpo." Beloff and Pipitone testified that shortly thereafter, they began receiving winning tickets from either Lichtman or petitioner to be verified and cashed. Beloff testified that he cashed approximately $100,000 worth of winning twin double tickets received from either Lichtman or petitioner, and that he would give the proceeds from the cashed tickets to either Lichtman or petitioner. Pipitone testified that he cashed between $90,000 and $100,000 worth of winning twin double tickets for either Lichtman or petitioner, and that he gave the proceeds from the cashed tickets to either Lichtman or petitioner. In making these general statements, neither Beloff nor Pipitone identified specific cashing transactions, and neither of them specified exactly for whom he had received the winning tickets or to whom he had given the proceeds. Both Beloff and Pipitone testified that on a few occasions, *110 petitioner and Lichtman had winning twin double tickets which they would not give to Beloff and Pipitone to cash for them. Beloff and Pipitone testified that on such occasions, petitioner and Lichtman told them that they had to cash some tickets for themselves so as to avoid suspicion at income tax time. As to specific transactions in which they allegedly cashed winning twin double tickets for the "Harpo mob," each could only detail one such transaction. Beloff testified that he cashed a winning twin double ticket for $13,800.20. He stated that the ticket was given to him by Lichtman, and that he had an independent recollection of this transaction with Lichtman. As to the proceeds, Beloff originally testified that he gave the proceeds to either Lichtman or petitioner. Then when he was pressed by the court in the criminal proceeding to be more specific as to whom he had given the proceeds, the following colloquy took place between the court and Beloff: "Q. Can you recall which of the two?" "A. Well, I was told to give it to either one." "Q. Yes, assuming that was so, but can you now recall to whom you gave it?" "A. At that particular time I think it was Mel (Lichtman)." *111 "Q. Are you reasonably sure it was Mel?" "A. I am reasonably sure." "Q. And we are agreed that you gave him $13,800.20." "A. Right, sir." Finally, on cross-examination, Beloff testified that he gave the entire proceeds to petitioner. This $13,800.20 ticket which Beloff testified that he cashed corresponds to the $13,800.20 ticket cashed by the petitioner and reported in his 1964 return. Pipitone testified that he cashed a winning twin double ticket for $11,158.60. He stated that "Mel and Harpo" gave him the ticket and that he cashed it for them. Later he stated that he believed that Lichtman had given him the ticket. Still later, when asked to whom he had given the money, Pipitone stated that "I don't recall which one I gave it to. I think it was Mel." Then he stated, "I believe it was Mel." Edward Osterweil, another government witness at the criminal trial, testified that he met Lichtman in June of 1964 at Yonkers Raceway, and that he cashed winning twin double tickets for Lichtman totalling "close to two hundred thousand" dollars. Specifically, he testified to six of the eight substantive counts considered at the criminal trial, said substantive counts totalling $80,443.30 *112 in winning twin double tickets. (These same winning tickets are now relied upon by respondent in the instant case.) Osterweil testified that he knew Beloff and Pipitone but that he had no connection with either of them. The transactions to which he testified involved only Lichtman 1040 and he never specifically identified the petitioner. Osterweil testified that he was a frequent visitor to Yonkers and Roosevelt Raceways but that (contrary to the testimony of Beloff and Pipitone) he did not know of the "Harpo mob" as such or of any particular "mobs" operating at either Yonkers or Roosevelt. He also indicated that he was not dealing with any partners or a combination of winning ticket cashers. Petitioner testified before this Court that he was friendly with Lichtman for about six years because they lived in the same block. He testified that he and Lichtman went to the track together approximately 15 times in 1964, but that they did not otherwise see each other socially. He indicated that on those occasions on which they went to the track together, he and Lichtman did not stay together at the track and would meet after the races to go home together. Petitioner stated he was not *113 a partner with Lichtman in any gambling venture or in any other kind of venture. Petitioner testified that he knew Beloff and Pipitone and that he would occasionally purchase "live" twin double tickets from them. He testified that Pipitone and/or Beloff never cashed a winning twin double ticket for him. Petitioner also testified that he knew Edward Osterweil by face only but that he never had any discussions or dealings with him. Petitioner further testified that Osterweil never cashed any winning twin double tickets for him. As to those transactions in winning twin double tickets which petitioner is alleged by the respondent to have had with one Marvin Starr (he did not testify at either the criminal trial or the proceeding before this Court), petitioner testified that he had never met Starr, had never seen him, and had never had anything to do with him in 1964, but that he met Starr "later on" when he found him in a cafeteria with some friends of his (petitioner's) from the neighborhood. The respondent is presumptively correct in his determination of a deficiency, and the petitioner *114 has the burden of proving that the determination is erroneous. Nevertheless, this presumption of correctness is one of law and not fact, and it disappers when evidence is introduced sufficient to sustain a contrary finding. Niederkrome v. Commissioner, 266 F. 2d 238 (C.A. 9, 1958). It is therefore incumbent upon the petitioner to introduce evidence which reasonably demonstrates that the respondent's determination is wrong. Allen v. Commissioner, 117 F. 2d 364 (C.A. 1, 1941); J.M. Perry & Co., Inc. v. Commissioner, 120 F. 2d 123 (C.A. 9, 1941). At trial, this Court ruled that there was no basis for charging petitioner with any of the amounts represented by any of the winning twin double tickets cashed by Marvin Starr. In view of petitioner's testimony and the fact that Starr did not testify in refutation of that testimony at either the criminal trial or the proceeding before this Court, we sustain our earlier ruling. As to those amounts charged to petitioner on the basis of the winning twin double tickets cashed by Beloff, Pipitone and Osterweil, petitioner testified at length, subject to cross-examination, that not one of these three *115 individuals ever cashed any winning twin double tickets for him. He also denied being involved in any partnership with Lichtman in any gambling venture or any other kind of venture. In attempting to prove a negative, namely, that he was not a partner with Lichtman and that Beloff, Pipitone and Osterweil did not cash winning twin double tickets for him, petitioner could only issue a denial as there were no means available to him to positively prove this negative. In the circumstances of this case, we find this denial by the petitioner of any involvement in any of the activities in question herein and his related testimony to be sufficient to sustain a finding contrary to the respondent's determination. In the face of such a denial, it was incumbent upon the respondent to come forward with evidence demonstrating or pointing to the falsity of that denial. Recognizing that the issue before this Court is whether the petitioner received income which he did not report, we cannot find that the respondent has produced any evidence which is sufficient to directly refute the testimony of the petitioner; and we therefore hold that he has not met his burden of going forward with the evidence. *116 In the first instance, respondent's case as to the amounts charged to petitioner from the winning tickets cashed by Beloff and Pipitone hinges on the vague and confusing testimony of each of those individuals that he cashed approximately $100,000 in winning twin double tickets for either Lichtman or 1041 petitioner. Their testimony was constructed in such a way as to constitute proof of a general conspiracy; and, for the most part, Beloff and Pipitone did not specify from which of the two, Lichtman or petitioner, they had received the winning tickets which they allegedly cashed or to which of the two they had paid the proceeds of the winning tickets they allegedly cashed. Each could testify only to a single specific transaction in which a winning ticket was cashed for either Lichtman or petitioner; and, with respect to such specific transactions, the testimony of each was confusing and contradictory. In addition, the $13,800.20 winning ticket which Beloff testified that he cashed corresponds to the $13,800.20 ticket cashed by the petitioner and reported in his 1964 tax return. There has been no explanation by the respondent as to why petitioner would arrange to have another *117 person cash a winning ticket for him so that he could avoid reporting the winnings as income and then go on to report such income in his return. Furthermore, the respondent has not included this ticket as part of the total unreported income which he would include in the petitioner's gross income for 1964. In these circumstances, the testimony of Beloff and Pipitone relating to the amounts purportedly received by petitioner from them means nothing. Edward Osterweil testified only as to the transactions he had had with Lichtman. He did not identify the petitioner, and he did not specifically identify any tickets which he had received from the petitioner for cashing or any proceeds from the cashing of such tickets which he gave to the petitioner. We also find no merit in the respondent's emphasis upon the petitioner's conspiracy conviction in the criminal trial. In that trial, the petitioner could have been found guilty on the charges against him merely by being part of a group which conspired to cash winning tickets and without actually giving any such tickets for cashing. Consequently, such conviction by itself is not sufficient to sustain the tax liability in the instant proceeding. *118 In view of these considerations, we cannot find that the respondent has established a direct flow of specific amounts of specific funds from Beloff, Pipitone and Osterweil to the petitioner. Therefore, the respondent must depend on proof of the existence of a partnership between Lichtman and the petitioner in order to refute the petitioner's testimony and sustain his determination. This is especially true with respect to the amounts charged to the petitioner on the basis of those winning twin double tickets cashed by Edward Osterweil, since Osterweil dealt only with Lichtman and did not identify the petitioner. Petitioner denied the existence of a partnership between Lichtman and himself (as did Lichtman at the criminal trial) at both the criminal trial and in the proceeding before this Court. Osterweil testified only to transactions with Lichtman, did not identify the petitioner, and was not aware of any "mobs" or "syndicates" at the Roosevelt or Yonkers Raceway which engaged in cashing winning twin double tickets. On this basis, the mere characterization by Lichtman, as testified to by Pipitone, of petitioner as his "partner" does not establish the existence of a partnership *119 for purposes of this case. As utilized by Lichtman to describe the petitioner, the term "partner" could have referred to petitioner as a "partner" in the colloquial sense of being a person with whom he rode to and from the track or a racetrack "buddy." Without more, such a vague reference is not sufficient to establish an agreement between Lichtman and petitioner to share in the proceeds derived from having winning twin double tickets cashed by others. The testimony of Beloff and Pipitone that they cashed winning tickets for "either" Lichtman "or" the petitioner is also not sufficient to establish a partnership between the two for the purpose of carrying on the illicit venture ascribed to them. The terms "either/or" do not directly establish the existence of an agreement between Lichtman and the petitioner to share in the proceeds from the winning twin double tickets cashed by Beloff, Pipitone and Osterweil but connote, if anything, the separate existence of a ticket cashing venture for each Lichtman and petitioner. In addition, as discussed above, the testimony of Beloff and Pipitone in this regard was vague and contradictory. It was also in their own interest to attempt to place *120 elsewhere the blame for their own misdeeds. On this basis, we cannot find the "either/or" testimony of Beloff and Pipitone to be sufficient to establish a partnership between the petitioner and Lichtman. Furthermore, in light of Edward Osterweil's testimony that he, having engaged in six cashing transactions with Lichtman and 1042 being a frequent visitor to the racetrack in question, was not aware of any "Harpo mob" or any other "mob" or "syndicate" organized for the purpose of covering the field with twin double bets and arranging for the cashing of winning tickets by others, grave doubts must necessarily be cast upon the testimony of Beloff and Pipitone as it relates to the existence of a partnership between Lichtman and the petitioner. When Osterweil's testimony in this regard is coupled with the fact that he did not identify the petitioner or testify as to any transactions with him, the testimony of Beloff and Pipitone as to the existence of a partnership between the petitioner and Lichtman must be all but cast aside. In the proceeding before this Court, we have had the opportunity to hear the testimony of the petitioner and to observe its recordation. This testimony was *121 forthright and covered all aspects of this case, and we have found that this testimony was sufficient to sustain a finding contrary to the respondent's determination of a deficiency based on unreported racetrack winnings. With respect to the testimony of the witnesses upon which the respondent relies to refute the petitioner's testimony, we did not have the opportunity to hear and observe its recordation. While it would have been a simple matter for the respondent to call those witnesses who testified for the government at the criminal trial and to direct questions to those witnesses relating to the specific cashing transactions herein alleged to have resulted in unreported income to the petitioner, the respondent chose not to do so. Instead, he chose to rely entirely on the testimony given by the government witnesses at the criminal trial and his cross-examination of the petitioner in the instant proceeding. We have found the testimony of the government witnesses at the criminal trial to be patently vague and evasive and therefore insufficient to overcome the testimony of the petitioner. The cross-examination of the petitioner by the respondent in the instant proceeding was also *122 insufficient for this purpose. Thus, the respondent introduced no direct evidence linking the petitioner to any unreported racetrack winnings, and he has not established the existence of a partnership between the petitioner and Lichtman. On this basis, we have determined that the respondent has not met his burden of coming forward with evidence sufficient to overcome the testimony of the petitioner which was adequate to sustain a determination that the petitioner had no unreported racetrack winnings in 1964. Consequently, we are constrained to find for the petitioner on the questions of unreported income. II. Gambling Losses Petitioner contends that during 1964 he purchased losing twin double tickets in the amount of $9,724. In support of his claim, petitioner produced only a small number of the alleged losing tickets purchased by him in 1964. These tickets accounted for only $150 [10] of the claimed $9,724 in losses. Since the petitioner has failed to substantiate any of the remaining $9,574 in claimed losses, that amount of his deduction must be disallowed. *123 III. Section 6653(a) Penalties Since we have not found that the petitioner had additional racetrack winnings which he failed to report, we cannot find that such failure to report was due to negligence or intentional disregard for rules and regulations. Consequently, there is no basis for the assertion of the penalty under section 6653(a), [11] and the petitioner is not liable for the penalty asserted by the respondent under that section. Decision will be entered under Rule 50. 1043 Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.↩
2. The trial transcript of petitioner's criminal trial in the United States District Court, Southern District of New York, was made a part of the record in the instant case by the stipulation of the parties. The parties also stipulated that if the witnesses in the criminal trial were called in the instant case and asked the same questions recorded in the transcript of the criminal trial, they would give the same answers as recorded in that transcript.↩
3. This amount has been determined by doubling the amount of $124,632.60 which the respondent asserted in the "explanation of adjustments" section of his deficiency notice as the total of the petitioner's racetrack winnings.↩
4. In addition to those tickets listed below, the parties stipulated that Joseph Pipitone cashed a winning ticket for $11,158.60. However, the respondent did not utilize this ticket in making his assessment as to the total of the petitioner's 1964 racetrack winnings, and therefore we have not included it in those tickets listed below. ↩
5. Both the respondent in his opening statement at trial and the petitioner in his trial memorandum and his brief stated this total to be $43,343.70. ↩
6. In addition to those tickets listed below,the parties stipulated that Philip Beloff cashed a winning ticket for $13,800.20. This amount was exactly the amount of a winning ticket which the petitioner testified that he cashed and which was definitely reported as income in his 1964 tax return. The respondent has not utilized this ticket in determining the total amount of the petitioner's 1964 racetrack winnings, and therefore we have not included it in those tickets listed herein. However, he has apparently given the petitioner credit for reporting that amount in arriving at his determination of the total amount of petitioner's unreported racetrack winnings. ↩
7. Both the respondent in his opening statement at trial and the petitioner in his trial memorandum and his brief stated this total to be $81,013.60. However, the total of the proceeds of the 44 twin double tickets stipulated by the parties as having been cashed by Marvin Starr is the amount of $80,993.60 specified above.↩
8. While this amount is exactly $18.50 lessthan the amount of $249,265.20 set out above as the alleged total racetrack winnings received by the alleged partnership, it is nevertheless the sum of the proceeds from the winning tickets allegedly cashed for the alleged partnership by each of the individuals listed above. Standing by itself, the overstatement by the parties of the total amount of proceeds from the tickets allegedly cashed by Marvin Starr (see footnote 7) and our substitution of the correct amount in the above table would account for an understatement of $20. This understatement, however, must be reduced by $0.50 to account for the fact that both parties attributed only $43,343.70 to tickets allegedly cashed by Joseph Pipitone when the correct amount, based on the total of the tickets listed above as having been cashed by Pipitone, was $43,344.20. These adjustments would indicate that the amount of the understatement is $19.50 and not the resulting $18.50, and the additional differential of $1 can only be attributed to a mathematical error or mere oversight on the part of the parties.↩
9. Osterweil testified only as to tickets allegedly cashed by him for Lichtman, and he never identified the petitioner. Respondent relies entirely on the existence of a gambling partnership between petitioner and Lichtman to charge the petitioner with income received from the proceeds of tickets allegedly cashed by Osterweil.↩
10. Petitioner submitted 75 tickets as representing losing tickets. Based on the fact that petitioner indicated that almost all of these tickets were purchased by him at a cost of $2 per ticket, and in view of the fact that all the tickets were $2 tickets, we have allowed him a loss of $2 on each of the 75 tickets presented to this Court as losing tickets.↩
11. SEC. 6653. FAILURE TO PAY TAX. (a) Negligence or Intentional Disregard of Rules and Regulations with Respect to Income or Gift Taxes. - If any part of any underpayment (as defined in subsection (c)(1)) of any tax imposed by subtitle A or by chapter 12 of subtitle B (relating to income taxes and gift taxes) is due to negligence or intentional disregard of rules and regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment.↩